# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                **Plaintiff,**<br><br>v.<br><br>RAHIM MOHAMED,<br>DAVIES ("DAVE") WONG,<br>GLENN B. LAKEN,<br>RICHARD C. S. TANG,<br>ZOLTAN NAGY,<br>JEFFREY D. COX,<br>PHILLIP G. SEWELL,<br>BREANNE M. WONG,<br>CHRISTOPHE MERANI,<br>ANNA TANG,<br>ROBERT W. SEELEY,<br>RICHARD B. SMITH,<br>CHRISTOPHER R. SMITH,<br>H.E. CAPITAL SA,<br>POP HOLDINGS LTD.,<br>MAXIMUM VENTURES HOLDINGS LLC,<br>HARMONY RIDGE CORP., and<br>AVATELE GROUP LLC,<br><br>                **Defendants,**<br><br>9224-3708 QUEBEC, INC.,<br>      a/k/a DISTRIBUTIONS BANO, and<br>JASON BLACK,<br><br>              **Relief Defendants.** | CIVIL ACTION NO.<br><br><br>JURY TRIAL<br>DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1.      This case involves a fraudulent hacking scheme, in which the defendants, operating in two overlapping groups, and others, collectively acquired substantial shares of the common stock of two public microcap companies: Lotus Bio-Technology Development Corp. ("LBTD") and Good Gaming, Inc. ("GMER").  After obtaining the shares, certain of the defendants then conspired with other unknown parties to subject various retail brokerage accounts, held by innocent third-party investors, to online account takeover attacks ("ATOs" or "hacks").  The hacked accounts then were forced to make large purchases of LBTD and GMER common stock, thereby artificially inflating the trading price and volume of the stocks.  The defendants then sold the shares they had acquired at the inflated prices, generating approximately $1.3 million in proceeds and creating substantial profits for the defendants.

2.      Further, throughout the scheme, certain of the defendants repeatedly took steps to conceal their beneficial ownership of LBTD and/or GMER shares by, among other things, failing to file with the Commission certain beneficial ownership reports required by law.  In particular, Sections 13(d) and 16(a) of the Securities

-2-

Exchange Act of 1934 ("Exchange Act") and rules thereunder require those owning over certain percentages of a class of securities of an issuer to disclose such ownership, and their transactions in those securities, by timely filing certain forms with the Commission.

3.     More specifically, from approximately 2015 through 2018, defendants Christophe Merani ("Merani"), Rahim Mohamed ("Mohamed"), Zoltan Nagy ("Nagy"), Robert Seeley ("Seeley"), Phillip Sewell ("Sewell), Christopher Smith ("C. Smith"), Richard Smith ("R. Smith") (C. Smith and R. Smith together, the "Smiths"), Anna Tang ("A. Tang"), Richard Tang ("R. Tang") (A. Tang and R. Tang together, the "Tangs"), Breanne Wong ("B. Wong"), and Davies Wong ("D. Wong") (B. Wong and D. Wong together, the "Wongs"), and entities controlled by one or more of them, including Avatele Group LLC ("Avatele"), Harmony Ridge Corp. ("Harmony"), H.E. Capital SA ("H.E. Capital"), Maximum Ventures Holdings LLC ("Maximum"), and POP Holdings Ltd. ("POP") (collectively, the "LBTD Group"), together gained control of large blocks of LBTD common stock constituting most of the outstanding shares, failed to file the above-referenced reports required by the beneficial ownership reporting provisions of the Exchange Act, took other steps to conceal their interests in LBTD, and sold or coordinated the sale of LBTD stock into one

or more of the hacks that forced the purchases of LBTD stock.

4.     From at least 2015 through late 2017, Nagy, the Tangs, the Wongs, and Sewell collaborated to transfer substantial LBTD shares to Tang-controlled entities and then further launder the shares by transferring most of them to the Wongs or the Wongs' nominees, and to secretly control LBTD.

5.     The Wongs concealed their beneficial ownership of LBTD through layers of offshore accounts and nominees.  None of the LBTD Group's ownership of, or involvement with, LBTD was publicly disclosed, except for that of Nagy.

6.     Similarly, in late 2017 through early 2018, defendants Jeffrey Cox ("Cox"), Glenn Laken ("Laken"), Mohamed, and R. Tang (collectively, the "GMER Group") collaborated to transfer substantial shares of GMER common stock indirectly controlled by Laken to an offshore brokerage account, and to conceal Laken's indirect ownership of the stock.

7.     The hacks and ensuing forced purchases of LBTD stock occurred on August 16, 2017 and September 19, 2017.  The hacks and ensuing forced purchases of GMER stock occurred on January 22, 2018.  Mohamed coordinated the hacks. The hackers, acting in concert with one or more of the defendants, or others, caused the hacked brokerage accounts to purchase large quantities of shares, thereby inflating the prices.  The owners of the accounts that purchased the shares did not

authorize the purchases.

8.     At virtually the same time as the respective hacks, certain defendants in both the LBTD Group and the GMER Group sold large blocks of the two respective microcap companies into the market at artificially high prices that resulted from the forced purchases in the hacked accounts.  In multiple instances, the defendants sold stock executed directly to the forced purchases in the hacked accounts.

9.     As a result of the conduct alleged herein, defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong violated, and unless restrained and enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5].

10.     As a result of the conduct alleged herein, defendants Cox, Harmony, H.E. Capital, Laken, Maximum, Merani, Mohamed, Nagy, POP, Seeley, Sewell, C. Smith, R. Smith, A. Tang, R. Tang, B. Wong, and D. Wong aided and abetted violations of, and unless restrained and enjoined, will continue to aid and abet violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11.    As a result of the conduct alleged herein, defendants Nagy and R. Tang violated, and unless restrained and enjoined, will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

12.    As a result of the conduct alleged herein, defendant Mohamed violated, and aided and abetted violations of, and unless restrained and enjoined will continue to violate and aid and abet violations of, Section 9(a) of the Exchange Act [15 U.S.C. § 78i(a)].

13.    As a result of the conduct alleged herein, defendants Avatele, Maximum, Nagy, A. Tang, R. Tang, B. Wong, and D. Wong violated, and unless restrained and enjoined will continue to violate, Sections 13(d) and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(d) and 78p(a)] and Rules 13d-1 and 16a-3 thereunder [17 C.F.R. §§ 240.13d-1 and 240.16a-3].

14.    As a result of the conduct alleged herein, relief defendants 9224-3708 Quebec, Inc., a/k/a Distributions Bano ("Distributions Bano"), and Jason Black ("Black") received ill-gotten gains from the fraud and were unjustly

enriched thereby.

## **JURISDICTION AND VENUE**

15.     The Commission brings this action pursuant to the authority

conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§

77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

16.     This Court has jurisdiction over this action pursuant to Section 22(a)

of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act

[15 U.S.C. § 78aa(a)].

17.     In connection with the transactions, acts, practices, and courses of

business described in this Complaint, defendants, directly and indirectly, made

use of the means and instruments of transportation or communication in interstate

commerce or the means and instrumentalities of interstate commerce, or the

mails.

18.     Venue is proper in this district as many of the defendants are foreign

nationals residing outside the United States.  In addition, all of the ATOs involved

the unauthorized access of one or more brokerage accounts via the use of

computer servers located in the Northern District of Georgia.

## FACTS

**A.    Defendants**

19.    **Avatele Group LLC** is a privately held Wyoming limited liability company that was organized on March 11, 2015 and, during the relevant periods, was managed by R. Tang.  R. Tang and A. Tang were also members of Avatele during the relevant periods.

20.    **Jeffrey D. Cox**, age 56, is a Canadian citizen who resides in Calgary, Alberta, Canada.  During the relevant periods, he was the President and CEO of First Calgary Capital, which offered "investor relations" services and "awareness" campaigns for microcap companies.

21.    **Harmony Ridge Corp.** is or was a privately held Nevada entity that was originally incorporated on April 30, 2015, and then reincorporated in Wyoming on March 12, 2019.  Harmony was wholly owned by R. Tang during the relevant periods.

22.    **H.E. Capital, SA** is a privately held Nevis entity that was incorporated on September 26, 2000, and is based in the Dominican Republic. R. Smith is H.E. Capital's co-founding director and was its 50% owner during the relevant periods.  Upon information and belief, R. Smith's son, C. Smith, was H.E. Capital's Secretary during the relevant periods.  R. Smith and Seeley were

authorized signatories on an H.E. Capital brokerage account relating to the allegations herein.  Upon information and belief, during the relevant periods, Seeley ran H.E. Capital's day-to-day operations.

23.     **Glenn B. Laken,** age 68, resides in Chicago, Illinois.  He is the President, Chairman, and controlling shareholder of CMG Holdings Group, Inc., f/k/a CMG Holdings, Inc. (OTC Markets: CMGO) ("CMGO"), a publicly-traded microcap company that was, in turn, the controlling shareholder of GMER in at least May 2017.  Laken was convicted of securities fraud in connection with a stock promotion scheme in the early 2000s and, as a result, he served a 63-month federal prison sentence.

24.     **Maximum Ventures Holdings LLC** is a privately held Wyoming entity that was organized on April 13, 2015.  During the relevant periods, Maximum was 100% owned by A. Tang, and jointly controlled by both of the Tangs.

25.     **Christophe Merani**, age 31, resides in Glendale Heights, Illinois.  Merani is an associate of Sewell, who worked with D. Wong during the relevant periods.

26.     **Rahim Mohamed**, age 45, is a Canadian citizen who resides in Calgary, Alberta, Canada and the Cayman Islands.  He is the 100% owner of

Nexium Financial Inc. ("Nexium"), a privately held Canadian company.  He also is the CEO and Chairman of Softlab9 Technologies, Inc. (OTC Markets: SOFSF).  Mohamed controls or controlled a brokerage firm in the Cayman Islands called White Sands Securities SEZC.

27.    **Zoltan Nagy**, age 55, is a Canadian citizen who resides near Vancouver, British Columbia ("BC"), Canada and has ties to Point Roberts, Washington.  Nagy founded LBTD and has been its controlling shareholder for many years, though he divested himself of his share ownership on at least one occasion.  LBTD's public filings state that Nagy served as LBTD's sole officer and director from LBTD's inception in 2011 until April 1, 2016, then again from February 10, 2017 until June 19, 2017, and again from April 10, 2019 through at least July 6, 2022.  He remains a director of LBTD at present.  At all times relevant, Nagy was also the sole officer and director of microcap public company Black Rock Petroleum Company (OTC Markets: BKRP), a spin-off of LBTD.

28.    **POP Holdings, Ltd.** is a privately held Nevis entity that was incorporated on January 3, 2007 and is based in the Dominican Republic.  During the relevant periods, C. Smith was POP's 100% owner, Director, President, and Treasurer, and his father, R. Smith, was its Secretary.  The Smiths and Seeley were authorized signatories on a POP brokerage account relating to the

allegations herein.  Seeley, upon information and belief, ran POP's day-to-day operations during the relevant periods.

29.    **Robert W. Seeley**, age 48, is a British citizen who resides in the Dominican Republic.  During the relevant periods, Seeley worked with the Smiths, was an authorized signatory on certain relevant H.E. Capital and POP brokerage accounts, and upon information and belief, ran the day-to-day operations of both entities.

30.    **Phillip G. Sewell**, age 61, is a British citizen who resides in Vancouver, BC, Canada.  He and D. Wong co-founded Catalyst Capital Group, Inc. ("Catalyst Capital"), a privately held Canadian financial advisory firm of which D. Wong was the CEO during the relevant periods.

31.    **Christopher R. Smith**, age 52, is a British citizen who resides in the Dominican Republic.  Upon information and belief, he is R. Smith's son.  During the relevant periods, C. Smith was POP's 100% owner, Director, President, and Treasurer, and an authorized signatory on its relevant brokerage account.  Upon information and belief, during the relevant periods, C. Smith was H.E. Capital's Secretary.

32.    **Richard B. Smith**, age 78, is a British citizen who resides in the Dominican Republic.  Upon information and belief, he is C. Smith's father.

During the relevant periods, R. Smith was a Director of H.E. Capital and its 50% owner, the Secretary of POP, and an authorized signatory on brokerage accounts for both entities relating to the allegations herein.

33.    **Anna Tang**, age 43, is a Canadian citizen who resides in Richmond, BC, Canada.  She is R. Tang's wife and, upon information and belief, she is a cousin of D. Wong.  During the relevant periods, A. Tang wholly owned Maximum, jointly controlled Maximum with R. Tang, and was a member of Avatele.

34.    **Richard C. S. Tang**, age 44, is a Canadian citizen who resides in Richmond, BC, Canada.  He is A. Tang's husband and, upon information and belief, he is D. Wong's cousin by marriage.  During the relevant periods, R. Tang wholly owned Harmony and jointly controlled Maximum with his wife.  During the relevant periods, R. Tang managed and was a member of Avatele.  He has been the sole officer and director of microcap public company Sino American Oil Company (OTC Markets: OILY) and the CEO and sole director of microcap public company Caduceus Software Systems Corp. (OTC Markets: CSOC).

35.    **Breanne M. Wong**, age 33, is a Canadian citizen who resides in Panama and Vancouver, BC, Canada.  During the relevant periods, she and her parents were the control persons of 680220 BC Ltd. ("680220 BC"), a privately

held Canadian entity that traded the stock of LBTD.  Upon information and belief, she has held a Canadian securities license since 2011, and she formerly was a stockbroker for a Panamanian brokerage firm.

36.    **Davies Wong**, age 62, is a Canadian citizen who resides in Vancouver, BC, Canada.  He is B. Wong's father and, upon information and belief, A. Tang's cousin.  He co-founded Catalyst Capital with Sewell, and served as its CEO during all relevant periods.  During all relevant periods, D. Wong, his wife, and B. Wong together controlled 680220 BC.  D. Wong is also the president and 100% owner of a privately-held BC entity named Fusion Business Group ("Fusion").

**B.    Relief Defendants**

37.    **9224-3708 Quebec Inc.** ("Distributions Bano") is a privately held Quebec, Canada corporation that at all relevant times claimed to be in the bathroom sink and tile business.  Upon information and belief, during the relevant periods Distributions Bano was 100% owned by Quebec resident Sophie LeRoux.

38.    **Jason Black**, age 46, is a resident of California and/or Georgia. Upon information and belief, during the relevant periods he was the 100% owner of Cann American Holdings, LLC ("Cann American"), a California entity.

**C.**   **Related Entities and Individual**

39.   **Good Gaming, Inc., f/k/a HDS International Corp.**, was incorporated in Nevada on November 3, 2008, and is based in Kennett Square, Pennsylvania.  GMER claims to be in the online gaming business.  Its common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is quoted on OTC Link, operated by OTC Markets Group, Inc. ("OTC Link") under the symbol GMER (formerly HDSI).

40.   **Lotus Bio-Technology Development Corp., f/k/a Starflick.com**, was incorporated in Nevada on March 24, 2011, and is or was based in Port Coquitlam, BC, Canada, though it was based in Point Roberts, Washington for much of the relevant period.  LBTD's corporate status has been revoked.  Since inception, LBTD has claimed to be a start-up in several lines of business, including low-budget films and Chinese organic products.  Its common stock was registered with the Commission pursuant to Exchange Act Section 12(g) at all relevant times, but in June 2021, LBTD filed a form with the Commission to terminate its securities registrations.  LBTD's common stock is still quoted on OTC Link, under the symbol LBTD (formerly STFK).

41.   **Kuldeep Sidhu, a/k/a Kip Sidhu** ("Sidhu"), age 50, is a Canadian citizen who resides in Abbotsford, BC, Canada.

**D.** **The LBTD-Related Conduct**

    **(a)** **The LBTD Group Lays the Groundwork for their Scheme by Taking Steps to Make LBTD Shares Readily Tradable**

42.    Nagy founded LBTD in 2011, and he has been its sole officer, director, and principal shareholder for most of its history.  In 2011 and 2012, Nagy caused LBTD to register its common stock with the Commission.  In 2012, Nagy caused LBTD to issue shares of its common stock to about 41 people residing in Hungary, Canada, and Japan, all of whom were Nagy's family and friends (the "Nagy Associates").  By late 2014, LBTD had 231,275,000 shares issued and outstanding, of which Nagy owned 86% and Nagy Associates owned 4.1%.  In addition, two foreign entities controlled by Nagy and/or the Nagy Associates, which had names that were identical to U.S.-based defendants Maximum and Harmony, owned 4.8% and 4.4% of LBTD's stock, respectively.

43.    In early 2015, R. Tang offered to assist Nagy in getting LBTD shares "cleared and deposited," meaning deposited into a brokerage account so that they could be readily traded.  R. Tang also told Sewell that Nagy was "interested in a small campaign," presumably to promote the stock.  Nagy and R. Tang thereafter exchanged emails attaching draft stock purchase agreements ("SPAs") that were backdated to 2013 and 2014, pursuant to which R. Tang (as Harmony's owner) and A. Tang (as Maximum's owner) agreed to buy LBTD shares from Nagy

Associates.

44.    Nagy and R. Tang then worked together to backdate and forge paperwork to establish the Tangs as the purported owners of Maximum and Harmony (and the entities' LBTD shares) as of 2013 and 2014, even though those entities were not formed in the U.S. until 2015.

45.    By backdating the purported ownership of shares, Nagy and the Tangs intended to facilitate the deposit of the shares into brokerage accounts, avoid the Commission's restrictions on Nagy's sale of the shares as an affiliate of LBTD, and avoid filing certain beneficial ownership reports required by law, including some of those described in Paragraph 2 herein.

46.    The Tangs tried to deposit Maximum's and Harmony's LBTD shares with several brokerage firms, in coordination with Nagy.  As part of that effort, the Tangs submitted false, backdated paperwork and falsified checks to broker-dealers.

47.    In October 2015, Maximum and Harmony successfully deposited their LBTD shares into separate accounts at a U.S. broker-dealer, BD-1.

48.    The Commission's beneficial ownership reporting rules, among other things, require the filing of a report with the Commission whenever a person (including a group acting in concert) is the direct or indirect beneficial

-16-

owner of more than 5% of a class of registered securities, and the filing of other reports by any person (including a group acting in concert) who is directly or indirectly the beneficial owner of more than 10% of a class of registered securities, or who is a director or officer of the issuer.

49.     In an attempt to avoid the Commission's beneficial ownership reporting rules, A. Tang inquired of BD-1 whether she could open "more accounts" with BD-1 so as to spread LBTD share ownership between multiple entities and stay "under 10%" ownership.  Subsequently, the Tangs transferred 2,500,000 of Maximum's shares to an account with another U.S. broker-dealer, BD-2.

### (b)     The Tangs Transfer Shares to the Wongs, Who Hide Their Beneficial Ownership

50.     In early 2016, the Tangs caused Maximum and Harmony to transfer 18,975,500 LBTD shares for the benefit of the Wongs, then representing 8.2% of LBTD's shares outstanding.  Harmony transferred all of its 10,375,500 shares held at BD-1, while Maximum transferred 8,600,000 of its shares held at BD-1 but retained 105,000 shares at BD-1 and 2,500,000 shares at BD-2.

51.     The Wongs hid their beneficial ownership of LBTD through offshore nominees, including H.E. Capital and POP, and through accounts at various offshore entities, including (1) Beaufort Securities, Ltd. ("Beaufort"), then a U.K.

brokerage firm; (2) Alabron Capital Corp. ("Alabron"), then a Belize brokerage firm; (3) Seton Securities International Ltd. ("Seton"), then a Bahamas brokerage firm; and (4) Silverton SA ("Silverton"), then a Swiss asset management firm. At all times during the relevant period, the Wongs acted in concert when acquiring, holding, and disposing of their LBTD shares.

52.     In early February 2016, R. Tang caused Harmony to transfer all of its 10,375,500 LBTD shares to Beaufort for the account of H.E. Capital.  Shortly afterwards, Harmony's shares were re-allocated among accounts at Beaufort in the names of H.E. Capital (4,000,000 shares), POP (4,000,000 shares), and Alabron (2,375,500 shares).  Then, on or about March 1, 2016, Maximum (by A. Tang) and B. Wong signed a SPA, pursuant to which B. Wong purported to buy 3,900,000 LBTD shares from Maximum.  On March 10, 2016, Sewell emailed a revised SPA to R. Tang, which A. Tang signed, substituting Wong-controlled entity 680220 BC as the purported buyer.

53.     On or about March 30, 2016, Maximum transferred 3,900,000 shares to a brokerage account with Seton in the name of B. Wong (rather than 680220 BC).  Both of the Wongs controlled and benefitted from the Seton account.  After the Wongs' acquisition of the 3,900,000 shares, they beneficially owned at least 14,275,500 shares of LBTD, then approximately 6.1% of the 232,775,000

outstanding shares.

54.     The Tangs, the Wongs, and Sewell were acting in concert in transferring LBTD shares among offshore accounts.  The SPAs between Maximum and B. Wong were a sham, and the check that B. Wong sent to Seton to support the purported purchase was fake.

55.     On April 1, 2016, LBTD filed with the Commission two Form 8-K current reports, both signed by Nagy, one reporting that Nagy was resigning as an officer and director on April 1, 2016, and one reporting that Nagy had cancelled 150,000,000 of his LBTD shares effective March 30, 2016.  As a result of the share cancellation, LBTD's outstanding shares decreased from 232,775,000 to 82,775,000, which increased the Wongs' beneficial ownership interest to approximately 15.7% of shares outstanding.

56.     The Wongs did not file with the Commission the required reports that would have disclosed these transactions or their beneficial ownership of LBTD shares.

**(c)     Additional Unreported LBTD Transactions by the Wongs**

57.     On April 1, 2016, the Wongs transferred 1,250,000 LBTD shares to another Seton client.  Then, on April 18, 2016 and April 20, 2016, the Wongs acquired another 1,700,000 and 3,000,000 LBTD shares, respectively, from

Maximum.  Maximum transferred these shares to nominees controlled by the

Wongs, and the Wongs were the beneficial owners of the shares.  The shares were

deposited into the same Alabron brokerage account into which the shares that the

Wongs had previously acquired beneficial ownership from Harmony had been

deposited.

58.     In sum, at the end of April 2016, the Wongs beneficially owned and

controlled approximately 17,725,500 shares of LBTD, or 21.4% of shares then

outstanding, through H.E. Capital (4,000,000), POP (4,000,000), an account in

the name of B. Wong at Seton (2,650,000), and upon information and belief, an

account at Alabron (7,075,500).

59.     The Wongs, the Tangs, Nagy, and Sewell, acting in concert with

each other, also continued to control the remaining approximately 2.5 million

shares held by Maximum at BD-2.

60.     On or about June 9, 2016, the Wongs acquired 900,000 more LBTD

shares from a Seton client.  They transferred these shares to another Seton client

on June 16, 2016.  The Wongs also sold approximately 65,600 shares of LBTD in

late June 2016 and acquired an additional approximately 800,000 shares from

another Seton client on or about August 1 and August 15, 2016.

61.     In October and November 2016, LBTD was the subject of a

promotional campaign during which LBTD was touted by at least sixteen internet newsletters, and LBTD issued press releases about its purported move into Chinese products and the cannabidiol ("CBD") business.  During this time, D. Wong, R. Tang, Sewell, and Nagy secretly controlled the day-to-day operations of LBTD.  The promotional campaign resulted in a substantial uptick in the price and trading volume of LBTD shares.

62.     Between October 6 and November 15, 2016, as the promotional campaign was underway, the Wongs sold approximately 202,070 shares through H.E. Capital for proceeds of approximately $35,837.

63.     Further, between October 19 and November 11, 2016, the Wongs sold approximately 240,100 shares for proceeds of approximately $33,312 (and bought 10,000 shares for approximately $2,008) through Alabron.  On October 21, 2016, the Wongs also transferred 3,000,000 shares of LBTD to another Seton client.

64.     On February 7, 2017, the Wongs acquired 397,469 shares of LBTD from a Seton client, and then, from March 1, 2017 through August 14, 2017, the Wongs used Seton to buy at least 1,614,953 more shares of LBTD on the public market in over 30 separate trades.

65.     From June 16, 2017 through August 14, 2017, the Wongs also used a

Canadian brokerage account in the name of their controlled entity, 680220 BC, to buy at least 217,186 additional shares of LBTD.

66.   Effective April 3, 2017, the Wongs transferred 500,000 shares of LBTD from their Seton account to Sewell's account with Seton.

67.   The Wongs again failed to file with the Commission any of the reports that were required to disclose their beneficial ownership and these transactions.

(d)   **Key Additional Pre-ATO Transactions
       and LBTD Group Activity**

68.   On October 1, 2016, Nagy and R. Tang signed a SPA, pursuant to which Nagy sold 50,000,000 shares of LBTD to Avatele, an entity controlled by the Tangs.  Nagy transferred his shares effective November 30, 2016.  The transaction, when combined with Maximum's preexisting ownership of 2,605,000 shares, gave the Tangs control of over 63% of LBTD's 82,775,000 outstanding shares at that time.

69.   At all times during the relevant period, the Tangs, Avatele, and Maximum acted in concert in acquiring, holding, and disposing of their LBTD shares.  The Tangs, Avatele, and Maximum failed to file required reports with the Commission regarding the November 30, 2016 acquisition.

70.   Nagy made a public filing with the Commission to report his sale,

which ostensibly left him with no remaining interest in LBTD.  Despite having

divested his shares and having resigned as an LBTD director and officer in April

2016, Nagy continued to work with R. Tang, D. Wong, and Sewell to operate

LBTD throughout the rest of 2016 and most of 2017.

71.   For example, upon information and belief, Nagy was the primary

author of LBTD's Form 10-K annual report filed with the Commission on

July 14, 2017, for LBTD's fiscal year ended March 31, 2017.  That report was

essentially a sham.  Among other things, Nagy simply moved the prior year's

numbers forward in both the financial statements and the narrative, such that the

numbers pertaining to 2015 became the numbers for 2016, and the numbers

pertaining to 2016 became the numbers for 2017.

72.   On June 7, 2017, Merani, an associate of Sewell's, opened a

brokerage account at a U.S. broker-dealer, BD-3, and began to buy one stock:

LBTD.  Merani funded the account with $10,000 from a bank account into which

Sewell had made payments in June 2017 totaling $5,500.  In his account

application at BD-3, Merani claimed to be the sole accountholder, listed his liquid

net worth as $12,000, and stated that he would fund the account with "salary,

wages, and savings."

73.   Merani bought approximately 108,358 LBTD shares in multiple

trades from June 13, 2017 through August 4, 2017.  He paid approximately $9,896 for the shares, representing the bulk of his $12,000 purported net worth.

74.     On August 14, 2017, shortly before the first LBTD hack, Merani sold 20,000 LBTD shares for approximately $3,950 in gross proceeds, and on August 25, 2017, he transferred $3,500 to his bank account.  Three days later, he wired $3,500 to Sewell. Upon information and belief, this transfer was a partial repayment of the funds advanced by Sewell to fund Merani's purchase of LBTD shares.

    (e)     **August 16, 2017 Hack: The Wongs Are the Principal Sellers**

75.     By August 1, 2017, the Wongs, the Tangs, and the Nagy Associates controlled most of LBTD's outstanding shares.  In early August 2017, LBTD's closing share price was in the range of $0.06-$0.07, and its average daily trading volume was 49,900 shares.  There were no shares traded on August 15, 2017.

76.     On August 16, 2017, unidentified persons conspiring with the LBTD Group hacked at least one retail brokerage account at a U.S. broker-dealer, BD-4, and forced the account to buy large quantities of LBTD stock.  Despite having had zero trading volume the day prior, the stock opened at $0.15, maintained an intra-day high of $0.15, and closed at $0.10, with daily trading volume spiking to 509,531 shares.

77.     The Wongs sold at least 260,999 of the LBTD shares reflected in the daily volume from their account at Seton for approximately $37,464 in gross proceeds, making the Wongs the principal sellers in the ATO.

78.     The largest single Seton sale order on August 16—an order to sell 250,000 of the Wongs' shares at $0.148 per share—was placed at 1:53 p.m. Eastern Time ("ET").  Between 1:54 and 1:56 p.m. ET, the hacker(s) caused the above-referenced BD-4 customer account to purchase 200,000 shares of LBTD at approximately $0.15 per share, and at 1:56 p.m. ET, Seton's largest trade of the day (a sale of 162,700 shares at $0.15 per share) executed directly against the hacked account.

79.     The BD-4 customer did not authorize these purchases.  BD-4 ultimately reimbursed its customer for the loss.

**(f)     Preparation for the Next ATO**

80.     Nagy and R. Tang subsequently worked together to create a corporate resolution and subscription agreement to support LBTD's re-issuance of 150,000,000 shares to Nagy.  Among other things, in late August 2017, Nagy signed, and sent to LBTD's transfer agent, corporate resolutions and related documents that falsely identified Nagy as a "control person and officer" of LBTD.

81.     In fact, LBTD filed reports with the Commission in August, September, and November 2017 that identified another person, not Nagy, as LBTD's officer and "sole member of the Board of Directors," and referred to Nagy as "our previous officer and director."

82.     On August 30, 2017, LBTD's transfer agent emailed Nagy a statement confirming the issuance to him of 150,000,000 restricted shares, constituting approximately 64% of LBTD's new 232,775,000 shares outstanding. Nagy failed to file a required report with the Commission regarding Nagy's acquisition of a controlling interest in LBTD.

83.     Meanwhile, on August 28, 2017, the Tangs signed forms instructing BD-2 to sell Maximum's remaining 2,500,000 shares of LBTD gradually.  In emails from Maximum signed "Richard and Anna," the Tangs told BD-2 to sell in "perpetuity," stating that "we should start at 12 cents," and claiming that the price of shares of LBTD was poised to "climb because this stock used to be 50 cents."

84.     LBTD had only five days in its history on which its share price exceeded $0.50, and the last of those days was over a year prior to the Tangs' email and on a day where 4,000 total shares traded.  Nevertheless, the Tangs told BD-2 that the sales price range should be "12 cents up to $2" in "small offers of 4,000, 5,000, 6,000 etc…."  Upon information and belief, the Tangs were able to

make that representation because they were aware of the scheme to artificially drive up the price of shares of LBTD by fraudulent means.

85.    On the date of the Tangs' email, approximately 5,000 total shares of LBTD traded, at about $0.07 per share.

86.    R. Tang and Nagy subsequently worked to draft an LBTD press release touting its proposed CBD/cannabis business.  LBTD issued the press release on September 6, 2017.  R. Tang also emailed stock promoters to tout LBTD through other means, such as tweets and mass email campaigns.

87.    On September 12, 2017, R. Tang emailed a promoter: "We need more firepower on LBTD[.]  Can you help more please?"

88.    On September 15, 2017—the Friday before the second LBTD ATO, which took place on September 19, 2017—one or both of the Tangs, through Maximum's email account, emailed BD-2 asking that it "bring the selling price to 10 cents with the same selling lots of 3k to 10k per penny rise.  We want to be getting some action at a lower price and it's very stagnant."  The Tangs requested a sale price range of "10 cents up to $2" because, on information and belief, they were aware of the plan to drive the share price up through the fraudulent scheme. LBTD had not traded at 10 cents or higher at any point in September 2017 at the time of their email.

89.     On September 15, 2017, Maximum sold 40,000 shares, leaving it with a balance of 2,460,000 shares at BD-2.  Despite the Tangs' control of Maximum and their total ownership stake in LBTD still remaining at over 20% at that time, neither the Tangs, Avatele, nor Maximum filed a required report of the sale with the Commission.

90.     On Sunday, September 17, 2017, one or both of the Tangs, through Maximum's email account, sent an email to BD-2 that stated: "Thank you.  Start with 2 or 3k blocks.  This is going to have upward momentum since we are the only ones with stock.  So minimum blocks up thx!"  (Emphasis added.)

91.     Upon information and belief, the Tangs knew that LBTD shares were "going to have upward momentum" because they were aware of the scheme to artificially drive up the price of shares of LBTD through fraudulent means.

92.     On Monday, September 18, 2017, the day before the second LBTD hack, BD-2 informed the Tangs that Maximum's account had been closed and no further orders would be taken.

93.     R. Tang responded, stating, among other things, that he did not understand why the account was being closed and that the Tangs actually held "under 1.5%" of LBTD's outstanding shares, such that the statement about controlling all of LBTD's stock was merely "off the cuff."  The statement by

R. Tang that the Tangs held "under 1.5%" was false.  In fact, when R. Tang made this statement, the Tangs held 2,460,000 shares at BD-2 through Maximum, 105,000 shares at BD-1 through Maximum, and 50,000,000 shares through Avatele, for a total of 52,565,000 shares, or approximately 22.5% of LBTD's outstanding stock.

94.    Meanwhile, on September 18, 2017, Seeley directed that 3,835,400 LBTD shares be transferred from the accounts at Alabron held in the names of the Wongs' nominees to another brokerage firm, to be held in an account in the name of Catanga International S.A. ("Catanga"), a Belize entity controlled by Seeley. Upon information and belief, the Wongs continued to be the beneficial owners of these shares.

### (g)    September 19, 2017 Hack: <u>The Wongs Again are the Principal Sellers</u>

95.    On September 19, 2017, from approximately 10:55 a.m. to 2:48 p.m. ET, at least 24 retail brokerage accounts at four U.S. brokerage firms were hacked and forced to buy millions of LBTD shares.  The brokerage firms were BD-3, BD-4, and two additional brokerage firms, BD-5 and BD-6.   Upon information and belief, the hacks were coordinated by Mohamed.

96.    Although LBTD's stock price on September 19, 2017 opened at $0.079 and closed at $0.05, its intra-day high jumped to $0.28—more than triple

its opening price.  Further, LBTD's daily trading volume was over 11.5 million

shares on September 19, 2017, as compared to just 400 shares the previous day.

Over 7.75 million of these were shares beneficially owned by the Wongs and sold

into the hack.  The hacked brokerage accounts suffered substantial losses.  The

hacking victims' brokerage firms promptly reimbursed their customers, with total

losses to the brokerage firms exceeding $1 million.

97.     The Wongs were the principal sellers on September 19, 2017,

obtaining gross proceeds of over $1 million as follows: (1) H.E. Capital sold

3,797,930 shares for approximately $559,104; (2) POP sold 2,347,670 shares for

approximately $345,607; and (3) B. Wong sold 1,608,954 shares through her

account at Seton, for approximately $187,764.

98.     At one point, Seeley instructed Beaufort to sell "1,800,000 LBTD @

13c for the day" on behalf of H.E. Capital/POP, and the price and volume spikes

in LBTD were unusual enough that the brokerage firm emailed Seeley: "Wowers!

Sold the 1.8m!"

99.     At the close of trading, Seeley emailed Beaufort (copying R. Smith)

to ask that the shares be "booked" as 2,347,670 shares sold by POP and 3,797,930

shares sold by H.E. Capital.

100.    The Wongs did not file required reports with the Commission

disclosing any of their transactions in LBTD shares.

101.   On September 19, 2017, Merani, directly or through other defendants, sold 30,000 shares of LBTD through his BD-3 account and realized approximately $4,000 in profits from the sales.  At least some of Merani's sales executed directly against the hacked accounts that were forced to purchase shares of LBTD.  Merani tried to sell additional shares of LBTD on September 19, 2017, but the trades did not execute.

102.   On September 19, 2017, an Internet Protocol ("IP") address that was registered to D. Wong's wife (who is also B. Wong's mother) was used to access Merani's BD-3 account.  The physical billing address for this IP address matches the address for Catalyst Capital, the business co-founded by D. Wong and Sewell, and the two phone numbers connected to the IP address are Catalyst Capital's and D. Wong's.

103.   The IP address referenced in the preceding paragraph was also used: (a) to access Merani's BD-3 account at least 60 times between June 2017 and January 2018; (b) to access a Catalyst Capital bank account at least four times including on August 29, 2017; (c) to access Harmony's BD-1 account on at least April 19, 2017; (d) to access a Catanga brokerage account in April 2018; and (e) to send and receive money transfers from both D. Wong's and Sewell's personal

bank accounts in November 2018.

104.   One day after the September 19, 2017 ATO, D. Wong paid Nagy $2,000 CAD.

105.   Less than two weeks later, Beaufort wired approximately $517,000 to H.E. Capital and $309,000 to POP, from the entities' respective accounts, such amounts being nearly the same as the total proceeds of the two entities' September 19, 2017 sales of shares of LBTD through Beaufort.

106.   While the Wongs beneficially owned the LBTD shares sold by H.E. Capital and POP, those entities retained a portion of the proceeds from their sales of LBTD shares and, upon information and belief, a portion of that residual went to compensate those entities, the Smiths and Seeley.

107.   In early October 2017, POP wired approximately $200,000 to Nexium, an entity controlled by Mohamed, and H.E. Capital wired approximately $320,000 to relief defendant Distributions Bano, which, upon information and belief, was operated by associates of Mohamed during the relevant periods.

108.   On October 13, 2017, Catanga, a Seeley-controlled entity, wired approximately $45,000 to Fusion, a Wong-controlled entity, and Fusion, in turn, wired $19,000 to Sewell.  Upon information and belief, some or all of these payments were a distribution of proceeds from the sales of LBTD shares.

109.   In addition, around this time, at D. Wong's request, Alabron initiated a transfer of 3,845,400 shares from an account controlled by D. Wong back to LBTD's transfer agent, so that the shares could later be recorded in the name of Maximum, which was beneficially owned by the Tangs.  Nagy authorized the transfer on behalf of LBTD, although he was not then an officer of the company.

110.   In November 2017, per B. Wong's request the previous month, Seton wired $100,000 to B. Wong from her Seton account as "proceeds of sales of securities."  The day after the transfer was completed, B. Wong sent a $50,000 money order to Nagy and distributed the remaining funds among accounts controlled by the Wong family.  Upon information and belief, some or all of these payments were a distribution of proceeds from the sales of LBTD shares.

111.   In or around December 2017, some of the defendants began planning a third set of ATOs to force the purchase of LBTD shares in hacked accounts.  On December 19, 2017, Mohamed sent an email to Cox and Nagy with the subject line "LBTD" containing a breakdown of the proposed sale of 52,000,000 shares for $5.2 million, including a distribution of $2.6 million, or 50%, to an investor relations or "IR Group."  Upon information and belief, "IR Group" was a coded reference to the hackers and 50% was a proposed hacking fee.  The proposed 50% payment to the anticipated hackers was consistent with what Mohamed and his

associates received from the proceeds in the LBTD and GMER ATOs.

112.   Upon information and belief, the December 2017 plan for a third set of ATOs was never carried out for unknown reasons.

113.   Upon information and belief, D. Wong was working directly with Sewell, Nagy, and others in the LBTD Group at the time of the LBTD ATOs, and the LBTD hacking attacks themselves were coordinated by Mohamed.

### E.   The GMER-Related Conduct

#### (a)   Prior to the Hack, Laken Surreptitiously Distributes GMER Shares to GMER Group Members as the GMER Group Prepares for the Manipulation

114.   In 2016, CMGO became GMER's controlling shareholder through CMGO's acquisition of certain GMER convertible preferred stock.  At this time, Laken was the controlling shareholder, CEO, and Chairman of CMGO.

115.   Around this time, Laken owned or controlled an approximately 61% stake in GMER, including his wife's holdings.

116.   In May 2017, GMER announced a change in control, pursuant to which an entity affiliated with a different GMER director replaced CMGO as GMER's controlling shareholder.

117.   In or around August 2017, Laken caused CMGO to convert some of its GMER preferred stock into 20,000,000 shares of GMER common stock.  In

November 2017, Laken began to try to monetize the GMER common stock owned by CMGO, working with R. Tang, Cox, Sidhu, and Mohamed to conceal Laken's beneficial interest in the shares and facilitate their sale.

118.   Laken, assisted by R. Tang, sought and obtained a legal opinion to remove the restrictive legend from the GMER shares.  The restrictive legend prevented the shares from being freely tradable because of Laken's substantial affiliation with GMER.  R. Tang forwarded the letter to Cox, and also emailed a friend that it was the "best…opinion [letter] ever written."

119.   On November 26, 2017, Laken emailed to R. Tang a proposed agreement between Laken and Cox, ostensibly to facilitate the eventual sale of the 20,000,000 GMER shares by Laken.  Pursuant to the agreement, Cox would act as "shareholder" for the sale of 20,000,000 GMER shares, with CMGO or Laken entitled to $500,000 as a "divisional capital proceeds recipient."  Upon information and belief, this structure was part of an attempt to conceal Laken's role in the planned sales.

120.   Meanwhile, and notwithstanding the above-referenced opinion letter, GMER's outside counsel objected to the removal of the restrictive legend from Laken's shares, and notified GMER's transfer agent that if CMGO owned 20,000,000 shares of GMER, it would then own over 87% of GMER's common

stock and, contrary to the opinion letter, be an affiliate of GMER.

121.   Shortly thereafter, Cox copied R. Tang on an email to a GMER representative, stating that Cox had "been in the business of successfully marketing and financing [penny stocks] for well over 20 years" and was "aware of all the latest successful formats for marketing securities…."  Cox also noted a plan to "slowly bring our investor group into GMER as we ease out Glens [sic] [*i.e.*, Laken's] common stock into [the investor group's] hands," and to enter into an "IR [investor relations] program" to "bring ongoing support and liquidity to GMER."  Cox added that "we can have the stock trading nicely at a much higher level by Christmas."

122.   On January 9, 2018, Cox emailed a transfer form to Seton (the same Bahamian brokerage firm used by the LBTD Group), signed by Laken, to transfer 1,500,000 GMER shares from CMGO into Cox's account at Seton.  Cox forwarded the email to Laken, Mohamed, and R. Tang, and notified GMER's transfer agent of the pending transfer.

123.   Also on January 9, 2018, Cox emailed R. Tang and Mohamed, attaching a draft email from Cox to Laken, referencing a "division of proceeds derived from the sale of 1.5 million shares of GMER," and stating: "Glenn, as discussed, on this transaction after marketing expenses and commissions, the net

capital remaining in [the] account will be equally divided 50/50 between our group and yours.  Please provide the wiring instructions."

124.    On January 10, 2018, Cox sent R. Tang a draft email to Black, memorializing Black's "finders fee."  The email stated: "Jason [Black], [d]erived from the sale of the initial block of GMER from my account at SETON Securities under the name Jeffrey Cox you will be paid…the sum of $15000.USD.  R. Tang is acting as escrow on this and has trading authorization on my account.  Jeffrey Cox."

125.    At the behest of Laken, Cox, and R. Tang, GMER's transfer agent ultimately transferred a total of 2,921,000 GMER shares into Cox's account at Seton on or about January 12, 2018 (1,121,000 shares) and January 18, 2018 (1,800,000 shares).  R. Tang, at Laken's request, added Laken's signature to the transfer agent paperwork, and Cox sent certain required forms to the transfer agent.

126.    On January 15, 2018, one week prior to the GMER hack, Cox emailed Mohamed the URL for GMER's website, and Mohamed forwarded the email to an unidentified individual using an encrypted email account.  Mohamed told the unidentified person: "We are good to go at 50%[.]  Funds will be journaled over to your account as soon as it opens at Seton."  Upon information

and belief, the unidentified person was one of the hackers or someone working with the hackers, and 50% of proceeds was the fee charged by the hackers.

127.    On January 17, 2018, Cox emailed Seton, copying R. Tang and requesting that Seton transfer 500,000 GMER shares from Cox's account at Seton to Sidhu's account at Seton, with an SPA to follow that day.  Seton transferred the shares as requested.  However, there was no expectation that Sidhu would pay for the shares and Sidhu, in fact, never paid Cox for the GMER shares.

128.    Upon information and belief, Laken retained control over these shares and this transaction was yet another effort to conceal such control by putting them in the account of an ostensibly unrelated party.

129.    On January 19, 2018, Cox emailed Seton, again copying R. Tang and giving R. Tang trading authority over Cox's account.  Cox also requested the transfer of "all" of his GMER shares to Sidhu's account.  In response, Seton transferred all of the remaining shares in Cox's account to Sidhu's account, except for 14,200 shares that remained in Cox's account.

130.    In the meantime, certain persons with ties to the GMER Group, including Laken's wife, R. Tang's father, and Sidhu, traded shares of GMER on the open market.  Because of the stock's relative prior illiquidity, the pre-ATO trading had the effect of increasing the stock's daily trading volume and "walking

up" its share price.

131.   On Sunday, January 21, 2018, the day before the hack, R. Tang emailed at least two stock promoters, copying Sidhu.  In one email, with the subject line "Awareness GMER," R. Tang stated, "I need help on GMER.  It is for immediate on Monday and Tuesday."  The message included both R. Tang's and Sidhu's phone numbers, and was signed "Richard and Kip."

132.   In a similar email exchange the same weekend of January 19-21, 2018, R. Tang arranged to pay $50 to a promoter for "Twitter awareness."  Upon information and belief, R. Tang was trying to supplement the upcoming GMER manipulation with Twitter promotions.

133.   During the evening of January 21, 2018, Cox emailed Mohamed: "R. We good for…tomorrow?"  Cox also emailed R. Tang, with the subject "Gmer," stating that, in light of "[t]he cash you put up with mine[,] we should see some reasonable action tomorrow," and "I trust Rahim [Mohamed] is good to go tomorrow or Tuesday."  In the meantime, Mohamed replied to Cox's email: "Yes we are good!!!"

134.   Cox forwarded Mohamed's response to R. Tang, asking him to "[p]lease read," and then also separately emailed R. Tang, stating, "Richard, Just got a [sic] email from Rahim saying he is good to go tomorrow.  I sent you a

copy.  Please call him and let me know what I can do to help."

**(b)** **The January 22, 2018 GMER Hack**

135.    On Monday, January 22, 2018, between about 10:30 a.m. and 11:30 a.m. ET, at least six retail brokerage accounts at BD-4 and BD-5 were hacked and forced to purchase nearly one million GMER shares.  GMER's daily trading volume on the hack date was 1,677,955 shares, a 3906.58% increase from the previous trading day's volume of 41,880 shares.

136.    On the prior trading day (Friday, January 19, 2018), GMER's stock price opened at $0.15 and closed at $0.17, with an intra-day high of $0.18.  On the hack date, GMER's stock similarly opened at $0.15 and closed at $0.1875, but the intra-day high was $0.29, nearly double the opening price, and the highest price at which the stock had traded in over nine months.

137.    GMER's average intra-day high over the one-month period prior to the hacks was just under $0.08 per share, and GMER's average daily volume over the same period was just over 31,000 shares traded.

138.    On January 22, 2018, at approximately 9:30 and 10:00 a.m. ET, just before the hacks, Cox twice verified with Seton that the GMER shares had been transferred from his account to Sidhu's.  Sidhu was acting in concert with Cox and the rest of the GMER Group.

139.   As the hacked accounts were being forced to buy shares of GMER (thus driving up its stock price), Seton accounts controlled by the GMER Group simultaneously sold over 700,000 shares of GMER into the market for over $169,000 in net proceeds, making those accounts the principal sellers on the date of the hack.  Nearly all of these sales occurred between 10:30 a.m. and 11:30 a.m. ET—*i.e.*, during the hacking attacks—and at least 440,000 of the GMER Group's shares held at Seton were sold directly to hacked accounts.  Specifically, Seton sold 701,688 shares for Sidhu (for the benefit of the GMER Group) at $0.265, for net proceeds of approximately $169,212, and 14,200 shares for Cox at $0.265, for net proceeds of approximately $3,424.

140.   Upon information and belief, Mohamed coordinated the hacking attacks of January 22, 2018.  Sidhu took trading instructions directly from Mohamed via WhatsApp, an encrypted messaging application, regarding these trades, including the specific prices and quantities for Sidhu's sale orders.  Sidhu then conveyed that information to Seton's principal via WhatsApp, and Seton placed the sale orders for Sidhu's account for the ultimate benefit of the GMER Group.

141.   Shortly after the ATO, Sidhu completed a questionnaire for Seton in which he falsely stated that he was the beneficial owner of the GMER shares sold

from his Seton account.  Sidhu also stated that he was not "aware of any information about the issuer...that ha[d] not been publically disclosed," and forwarded his responses to R. Tang.

142.    Following the ATO sales, the GMER Group divided the proceeds. On January 23, 2018, one day after the ATO, R. Tang sent an email to Sidhu and Mohamed with the subject line "Breakdown," which, upon information and belief, was a proposed breakdown of the proceeds generated by the GMER ATO. Among other things, the email stated, "705688 shares were Captured," "715200 shares were sold," and "[w]e believe 515688 was sold by Rahim [Mohamed]."

143.    R. Tang's email of January 23, 2018 stated that "169400 was net," and proposed to divide these proceeds as follows:

> Minus $25K in group[.]  Leaves $144400[.]  Rahim generated [$]123249.432 and fifty percent is [$]61624.716 paid for third party services.  $82775.284 is remaining.  Finder fee to Jason [B]lack who brought us the deal is owed $10,000.  Remains $81775.  If we give Glen[n] $55,000 it leaves us with $17,775.  Divide by three.  $5925.00 each to Rahim [Mohamed] me and Kip [Sidhu].

144.    Mohamed replied on the morning of January 23, 2018: "Let[']s discuss this today as I don't think my group will be happy with that."

145.    Upon information and belief, the reference to "$25K in group" in R. Tang's email of January 23, 2018 was to Sidhu and R. Tang; the reference to paying "fifty percent" for "third party services" was to the individuals who had

hacked the accounts at the behest of Mohamed; and the reference to "Glen[n]" was to Laken.

146.   Upon information and belief, Laken later sought to alter the GMER Group's planned division of the proceeds and take back CMGO's remaining shares of GMER stock.  As part of this, Laken proposed paying Cox nothing for his role in the scheme.

147.   On January 31, 2018, Cox emailed R. Tang, asking him to "ensure my piece of the GMER sale is available to me on settlement," and stating that "I put all of the individuals together to make it happen and deserve my percentage. Please do not make this problematic."

148.   R. Tang replied to Cox, stating falsely, upon information and belief, that the "distribution of the share sales were very minor," and that to "accommodate Glen[n] [Laken] getting his require[d] $75,000 we had to forfeit our round of pay because the 50% of awareness needs to be paid."  Upon information and belief, R. Tang was using "awareness" as code for hacking.

149.   R. Tang also told Cox that he and Sidhu had already paid $2,000 to Black, leaving $6,000 owed to Black "in the next round[.]"

150.   On February 5, 2018, Seton wired Sidhu approximately $164,000, consisting of proceeds from the GMER ATO.  The same day, Sidhu distributed

approximately: (1) $58,028 to CMGO, Laken's controlled entity; (2) $50,000 to Nexium, Mohamed's controlled entity; (3) $20,000 to R. Tang; (4) $20,000 to Sidhu's controlled entity; and (5) $6,000 to Cann American, Black's controlled entity.

151.   In addition, on February 5, 2018, Nexium (Mohamed) wired approximately $50,000 to Distributions Bano.  Thus, Distributions Bano received proceeds from both the LBTD and GMER ATOs, including the entire amount that went to Mohamed for his role in the GMER ATO.  Distributions Bano was unjustly enriched by the receipt of proceeds from the ATO schemes.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

152.   Paragraphs 1 through 151 above are hereby realleged and are incorporated by reference.

153.   From at least January 2015 through at least February 2018, defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more

-44-

particularly described above.

154.   Defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

155.   While engaging in the course of conduct described above, defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

156.   By reason of the foregoing, defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong, directly and indirectly, violated and, unless enjoined, will continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Section 17(a)(2) of the Securities Act
### [15 U.S.C. § 77q(a)(2)]

157.   Paragraphs 1 through 151 above are hereby realleged and are incorporated by reference.

158.   From at least January 2015 through February 2018, defendants Nagy and R. Tang, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate

commerce and by use of the mails, directly and indirectly, obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

159.   By reason of the foregoing, defendants Nagy and R. Tang directly and indirectly, have violated and, unless enjoined, will continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT III

### Violations of Section 17(a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(3)]

160.   Paragraphs 1 through 151 above are hereby realleged and are incorporated by reference.

161.   From at least January 2015 through February 2018, defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

162.   By reason of the foregoing, defendants Cox, Laken, Merani,

Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong, directly and indirectly,  have violated and, unless enjoined, will continue to violate, Sections 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT IV

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c)
### [17 C.F.R. §§ 240.10b-5(a) and (c)]

163.   Paragraphs 1 through 151 above are hereby realleged and incorporated by reference.

164.   From at least January 2015 through February 2018, defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly: employed devices, schemes, and artifices to defraud; and engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described herein.

165.   Defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong, knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, and

engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, the defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

166.   By reason of the foregoing, defendants Cox, Laken, Merani, Mohamed, Nagy, Sewell, A. Tang, R. Tang, B. Wong, and D. Wong, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## **COUNT V**

### **Violations of Section 10(b) of the Exchange Act**
### **[15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)]**

167.   Paragraphs 1 through 151 above are hereby realleged and incorporated by reference.

168.   From at least January 2015 through February 2018, defendants Nagy and R. Tang, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, all as

more particularly described above.

169.   Defendants Nagy and R. Tang knowingly, intentionally, and/or recklessly made untrue statements of material facts and omitted to state material facts.  In engaging in such conduct, the defendants Nagy and R. Tang acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

170.   By reason of the foregoing, defendants Nagy and R. Tang, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## COUNT VI

### Aiding and Abetting

171.   Paragraphs 1 through 151 above are hereby realleged and are incorporated herein by reference.

172.   From at least January 2015 through February 2018, defendants Cox, Harmony, H.E. Capital, Laken, Maximum, Merani, Mohamed, Nagy, POP, Seeley, Sewell, C. Smith, R. Smith, A. Tang, R. Tang, B. Wong, and D. Wong substantially assisted violations of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2) and 77q(a)(3)] and Section 10(b)

of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] set forth in Counts I through V, by, among other things, helping to transfer or conceal the ownership of shares used in the fraudulent schemes.

173.   Defendants Cox, Harmony, H.E. Capital, Laken, Maximum, Merani, Mohamed, Nagy, POP, Seeley, Sewell, C. Smith, R. Smith, A. Tang, R. Tang, B. Wong, and D. Wong knew or were reckless in not knowing that the primary violators were engaged in fraudulent activity and they knowingly, intentionally, and/or recklessly provided substantial assistance to the violations.

174.   As a result of the conduct described above, defendants Cox, Harmony, H.E. Capital, Laken, Maximum, Merani, Mohamed, Nagy, POP, Seeley, Sewell, C. Smith, R. Smith, A. Tang, R. Tang, B. Wong, and D. Wong aided and abetted violations of Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2) and 77q(a)(3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] set forth in Counts I through V above, and unless enjoined will continue to aid and abet such violations.

## COUNT VII

### Violations of Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)]

175.   Paragraphs 1 through 151 above are hereby realleged and are

incorporated by reference.

176.   From at least January 2017 through February 2018, defendant Mohamed, alone or with one or more persons, by use of the mails or the means and instrumentalities of interstate commerce, or of any facility of a national securities exchange, directly and indirectly, effected a series of transactions in a security or securities, creating actual or apparent active trading in such security or securities, or raising or depressing the price of such security or securities, for the purpose of inducing the purchase or sale of such security or securities by others.

177.   By reason of the foregoing, defendant Mohamed, directly and indirectly, has violated and aided and abetted violations of, and, unless enjoined, will continue to violate and aid and abet violations of, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i (a)(2)].

## COUNT VIII

### Violations of Section 16(a) of the Exchange Act [15 U.S.C. § 78l(a)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3]

178.   Paragraphs 1 through 151 above are hereby realleged and are incorporated by reference.

179.   From at least January 2015 through at least February 2018, defendants Avatele, Maximum, Nagy, A. Tang, R. Tang, B. Wong, and D. Wong, while directly or indirectly the beneficial owner of more than 10% of a class of

registered LBTD securities, or while a director or officer of issuer LBTD, failed

to file with the Commission: (1) Form 3, within 10 days after becoming a 10%

beneficial owner, officer, or director; (2) Form 4, before the end of the second

business day following the execution of a transaction involving a change in

beneficial ownership; and/or (3) Form 5, within 45 days after the issuer's fiscal

year end, to report all transactions and holdings that should have been reported

during the issuer's most recent fiscal year but were not.

180.   By reason of the foregoing, defendants Avatele, Maximum, Nagy,

A. Tang, R. Tang, B. Wong, and D. Wong, directly and indirectly, violated and,

unless enjoined, will continue to violate Section 16(a) of the Exchange Act [15

U.S.C. § 78i (a)(2)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

## COUNT IX

### Violations of Section 13(d) of the Exchange Act [15 U.S.C. § 78m(d)] and Rule 13d-1(a) [17 C.F.R. § 240.13d-1(a)]

181.   Paragraphs 1 through 151 above are hereby realleged and are

incorporated by reference.

182.   From at least January 2015 through at least February 2018,

defendants Avatele, Maximum, Nagy, A. Tang, R. Tang, B. Wong, and D. Wong,

directly and indirectly, individually or acting together in one or more

combinations for the purpose of acquiring, holding, voting or disposing of equity

securities, became the "beneficial owner" of more than 5% of a class of registered securities and failed to file a Schedule 13D with the Commission to report such ownership within 10 days after the acquisition.

183.   By reason of the foregoing, defendants Avatele, Maximum, Nagy, A. Tang, R. Tang, B. Wong, and D. Wong, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 13(d) of the Exchange Act [15 U.S.C. § 78m] and Rule 13d-1(a) thereunder [17 C.F.R. § 240.13d-1(a)].

## COUNT X

### Unjust Enrichment

184.   Paragraphs 1 through 151 above are hereby realleged and are incorporated by reference.

185.   Relief defendants Black and Distributions Bano received ill-gotten gains from the scheme and were thereby unjustly enriched.

### PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that the defendants named herein committed the violations alleged herein.

## II.

Permanent injunctions enjoining defendants from violating, directly or indirectly, or aiding and abetting violations of, the laws and rules alleged to have been violated in this Complaint.

## III.

An order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] prohibiting defendants Laken, Mohamed, Nagy, and R. Tang from acting as officer or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## IV.

An order barring defendants Cox, Harmony, H.E. Capital, Laken, Maximum, Merani, Mohamed, Nagy, POP, Seeley, Sewell, C. Smith, R. Smith, A. Tang, R. Tang, B. Wong, and D. Wong from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of

less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act
[17 C.F.R. § 240.3a51-1].

## V.

An order requiring the disgorgement by defendants of all ill-gotten gains or
unjust enrichment with prejudgment interest, to effect the remedial purposes of the
federal securities laws, and disgorgement of unjust enrichment by relief defendants
Black and Distributions Bano.

## VI.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C.
§ 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]
imposing civil penalties against defendants.

## VII.

Such other and further relief as this Court may deem just, equitable, and
appropriate in connection with the enforcement of the federal securities laws and
for the protection of investors.

## JURY TRIAL DEMAND

The Commission hereby demands a jury trial as to all issues so triable.

This 15th day of August, 2022.

/s/Robert K. Gordon
Robert K. Gordon
Georgia Bar No. 302482
gordonr@sec.gov

 /s/William P. Hicks
William P. Hicks
Georgia Bar No. 351649
hicksw@sec.gov

/s/M. Graham Loomis
M. Graham Loomis
Georgia Bar No. 457868
loomism@sec.gov

Counsel for Plaintiff
United States Securities and Exchange Commission
950 E. Paces Ferry Road NE
Suite 900
Atlanta, GA 30326
(404) 842-7600