## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | |
| **RAHIM MOHAMED,** | **Civ. Action No.** |
| **DAVIES ("DAVE") WONG,** | **1:22-cv-03252-ELR** |
| **GLENN B. LAKEN,** | |
| **RICHARD C. S. TANG,** | |
| **ZOLTAN NAGY,** | |
| **JEFFREY D. COX,** | |
| **PHILLIP G. SEWELL,** | |
| **BREANNE M. WONG,** | |
| **CHRISTOPHE MERANI,** | |
| **ANNA TANG,** | |
| **ROBERT W. SEELEY,** | |
| **RICHARD B. SMITH,** | |
| **CHRISTOPHER R.  SMITH,** | |
| **H.E. CAPITAL SA,** | |
| **POP HOLDINGS LTD.,** | |
| **MAXIMUM VENTURES HOLDINGS LLC,** | |
| **HARMONY RIDGE CORP., and** | |
| **AVATELE GROUP LLC,** | |
| **Defendants,** | |
| **9224-3708 QUEBEC, INC.,** | |
| **a/k/a DISTRIBUTIONS BANO, and** | |
| **JASON BLACK,** | |
| **Relief Defendants.** | |

## <u>SEC's MEMORANDUM IN SUPPORT OF ITS MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANTS AVATELE GROUP LLC, HARMONY RIDGE CORP. AND MAXIMUM VENTURES HOLDINGS LLC</u>

Plaintiff, Securities and Exchange Commission ("Commission" or "SEC") submits this memorandum of law in support of its motion, pursuant to Rule 55, Fed. R. Civ. P., for a default judgment against defendants Avatele Group LLC ("Avatele"), Harmony Ridge Corp. ("Harmony") and Maximum Ventures Holdings LLC ("Maximum") (collectively "Defaulted Defendants").

## *<u>PROCEDURAL HISTORY</u>*

On August 15, 2022, the Commission filed a Complaint alleging that defendants Harmony and Maximum aided and abetted violations of the antifraud provisions of the securities laws, specifically Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and defendants Maximum and Avatele violated certain reporting provisions, Sections 13(d) and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(d) and 78p(a)] and Rules 13d-1 and 16a-3 thereunder [17 C.F.R. §§ 240.13d-1 and 240.16a-3]. Fifteen other defendants were charged with violating

those and/or other provisions of the federal securities laws.  [Complaint, *Court Docket* ("*Dkt.*") No. 1].  The Complaint also named two relief defendants.

Defendants Avatele and Maximum were duly served on August 18, 2022 (*Id*. Nos. 5, 6).   Defendant Harmony was duly served on August 24, 2022 (*Id.* No. 8).   Defaulted Defendants did not seek extensions to file an answer.  Defaulted Defendants have failed to answer or otherwise respond as required by the Federal Rules of Civil Procedure. The Clerk entered defaults against Defaulted Defendants on March 14, 2023. (*Id.* No. 81).

## *ARGUMENT*

### A.    A DEFAULT JUDGMENT IS APPROPRIATE

The entries of judgments by default are appropriate against Defaulted Defendants. Defaults have been entered by the Clerk. Accordingly, the factual allegations of the Complaint, except those relating to damages, are taken as true. 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure*, § 2688, p. 412 (2d ed. 1983); *Thomson v. Wooster*, 5 S. Ct. 788 (1885).

### B.    FACTUAL ALLEGATIONS

The allegations of the Complaint which relate to Defaulted Defendants, which are accepted as true for default purposes, can be summarized as follows:

- Avatele is a privately held Wyoming limited liability company that was organized on March 11, 2015 and, during the relevant periods, was managed by defendant Richard C. S. Tang ("R. Tang"). R. Tang and defendant Anna Tang ("A. Tang.") (collectively "the Tangs") were also members of Avatele during the relevant periods. [*Dkt.* 1, ¶ 19].

- Harmony is or was a privately held Nevada entity that was originally incorporated on April 30, 2015, and then reincorporated in Wyoming on March 12, 2019. Harmony was wholly owned by defendant R. Tang during the relevant periods. [*Id.* ¶ 21].

- Maximum is a privately held Wyoming entity that was organized on April 13, 2015. During the relevant periods, Maximum was 100% owned by defendant A. Tang, and jointly controlled by both of the Tangs. [*Id.* ¶ 24].

- The case involves a fraudulent hacking scheme, in which the defendants, operating in two overlapping groups, and others, collectively acquired substantial shares of the common stock of two public microcap companies: Lotus Bio-Technology Development Corp. ("LBTD") and Good Gaming, Inc. ("GMER"). After obtaining the shares, certain of the defendants then conspired with other unknown parties to subject various retail brokerage accounts, held by innocent third-party investors, to online account takeover attacks ("ATOs" or "hacks"), in which associates of the defendants hacked into brokerage firms and took control of

4

certain customer accounts, without the customers' knowledge or permission. [*Id*. ¶ 1].

- The hacked accounts were then forced to make large purchases of LBTD and GMER common stock, thereby artificially inflating the trading price and volume of the stocks. The defendants then sold the shares they had acquired at the inflated prices, generating approximately $1.3 million in proceeds and creating substantial profits. [*Id.* ¶ 1].

- Further, throughout the scheme, certain of the defendants repeatedly took steps to conceal their beneficial ownership of LBTD and/or GMER shares by, among other things, failing to file with the Commission certain beneficial ownership reports required by law. [*Id.* ¶ 2].

- Defendants Avatele, Maximum and Harmony were a part of the group of defendants that participated in the LBTD portion of the scheme (the "LBTD Group"). From approximately 2015 through 2018, the LBTD Group gained control of large blocks of LBTD common stock constituting most of the outstanding shares, failed to file the reports required by the beneficial ownership reporting provisions of the Exchange Act, took other steps to conceal their interests in LBTD, and sold or coordinated the sale of LBTD stock into one or more of the hacks that forced the purchases of LBTD stock. [*Id.* ¶¶ 3, 4].

- By late 2014, LBTD had 231,275,000 shares issued and outstanding ("I/O"), of which defendant Zoltan Nagy owned 86% and about 41 of Nagy's family and friends (the "Nagy Associates") owned 4.1%. In addition, two foreign entities controlled by Nagy and/or the Nagy Associates, which had names that were identical to U.S.-based defendants Maximum and Harmony, owned 4.8% and 4.4% of LBTD's stock, respectively. [*Id.* ¶ 42]

- In early 2015, defendant R. Tang offered to assist defendant Nagy in getting LBTD shares "cleared and deposited," meaning deposited into a brokerage account so that they could be readily traded. Nagy and R. Tang thereafter exchanged emails attaching draft stock purchase agreements ("SPAs") that were backdated to 2013 and 2014, pursuant to which defendants R. Tang (as Harmony's owner) and A. Tang (as Maximum's owner) agreed to buy LBTD shares from Nagy Associates. [*Id.* ¶ 43].

- Nagy and defendant R. Tang then worked together to backdate and forge paperwork to establish R. Tang and A. Tang as the purported owners of defendants Maximum and Harmony, and the entities' LBTD shares, as of 2013 and 2014, even though those entities (defendants Maximum and Harmony) were not formed in the U.S. until 2015. [*Id.* ¶ 44].

- By backdating the purported ownership of shares, Nagy and the Tangs intended to facilitate the deposit of the shares into brokerage accounts, avoid legal

restrictions on Nagy's sale of the shares as an affiliate of LBTD, and avoid filing certain beneficial ownership reports required by law. [*Id.* ¶ 45]. In October 2015, based on forged or backdated documents, Maximum and Harmony successfully deposited their LBTD shares into separate accounts at a U.S. broker-dealer, BD-1. [*Id.* ¶¶ 45-47].

-    Subsequently, the Tangs transferred 2,500,000 of Maximum's shares to an account with another U.S. broker-dealer, BD-2. [*Id.* ¶ 49].

-     Thereafter, the Tangs, defendants Davies Wong ("D. Wong") and Breanne Wong ("B. Wong") (collectively "the Wongs"), and defendant Phillip Sewell ("Sewell") collaborated to further launder the shares by transferring most of them to the Wongs. The Wongs concealed their beneficial ownership of LBTD through layers of offshore accounts and nominees, including defendants H.E. Capital SA ("H.E. Capital") and POP Holdings LLC ("POP Holdings"), and through accounts at various offshore entities. [*Id.* ¶¶ 3, 4, 5, 49, 51, 52].

-    In early February 2016, R. Tang caused Harmony to transfer all of its 10,375,500 LBTD shares to Beaufort Securities, Ltd. ("Beaufort"), then a U.K. brokerage firm, for the account of defendant H.E. Capital. Shortly afterwards, Harmony's shares were re-allocated among accounts at Beaufort in the names of defendant H.E. Capital (4,000,000 shares), defendant POP Holdings (4,000,000

shares), and Alabron Capital Corp. ("Alabron"), then a Belize brokerage firm;

(2,375,500 shares).  [*Id.* ¶ 52].

- On or about March 30, 2016, Maximum transferred 3,900,000 shares to a

brokerage account with Seton Securities International Ltd. ("Seton"), then a

Bahamas brokerage firm, in the name of B. Wong.  The Wongs controlled and

benefitted from the Seton account.  After the Wongs' acquisition of the 3,900,000

shares, they beneficially owned at least 14,275,500 shares of LBTD, then

approximately 6.1% of the 232,775,000 outstanding shares. [*Id.* ¶ 53].

- On April 18, 2016 and April 20, 2016, the Wongs acquired another

1,700,000 and 3,000,000 LBTD shares, respectively, from Maximum.  Maximum

transferred these shares to nominees controlled by the Wongs, and the Wongs were

the beneficial owners of the shares.  [*Id.* ¶ 57].

- The Tangs, the Wongs, and Sewell were acting in concert in transferring

LBTD shares among offshore accounts.  The SPAs between Maximum and B.

Wong were a sham, and the check that B. Wong sent to Seton to support the

purported purchase was fake. [*Id.* ¶ 54].

- By the end of April 2016, the Wongs (with the assistance of Defaulted

Defendants and others) beneficially owned and controlled approximately

17,725,500 shares of LBTD, or 21.4% of shares then outstanding and, acting in

concert with other defendants, also controlled an additional approximately 2.5 million shares held by Maximum.  [*Id.* ¶ 59].

-    On October 1, 2016, Nagy and R. Tang signed a SPA, pursuant to which Nagy sold 50,000,000 shares of LBTD to defendant Avatele, controlled by the Tangs.  Nagy transferred his shares effective November 30, 2016.  The transaction, when combined with Maximum's preexisting ownership of 2,605,000 shares, gave the Tangs control of over 63% of LBTD's 82,775,000 outstanding shares at that time.  [*Id.* ¶ 68].

-    At all times during the relevant period, the Tangs, Avatele and Maximum acted in concert in acquiring, holding, and disposing of their LBTD shares.  The Tangs, Avatele and Maximum failed to file required reports with the Commission regarding the November 30, 2016 acquisition. [*Id.* ¶ 69].

### The August 16, 2017 Hack

-    By August 1, 2017, the Wongs, the Tangs, and the Nagy Associates controlled most of LBTD's outstanding shares.  In early August 2017, LBTD's closing share price was in the range of $0.06 - $0.07, and its average daily trading volume was 49,900 shares.  There were no shares traded on August 15, 2017. [*Id.* ¶ 75].

-    On August 16, 2017, unidentified persons conspiring with the LBTD Group hacked at least one retail brokerage account at a U.S. broker-dealer (BD-4) and

forced the account to buy large quantities of LBTD stock. Despite having had zero trading volume the day prior, the daily trading volume spiked to 509,531 shares. [*Id.* ¶ 76]. The Wongs sold at least 260,999 of the LBTD shares reflected in the daily volume for approximately $37,464 in gross proceeds, making the Wongs the principal sellers in the ATO. [*Id.* ¶ 77].

-   On September 15, 2017, Maximum sold 40,000 shares, leaving it with a balance of 2,460,000 shares at BD-2. Despite the Tangs' control of Maximum and their total ownership stake in LBTD still remaining at over 20% at that time, neither the Tangs, Avatele, nor Maximum filed a required report of the sale with the Commission. [*Id.*¶ 89].

-   On Sunday, September 17, 2017, one or both of the Tangs, through Maximum's email account, sent an email to BD-2 that stated: "Thank you. Start with 2 or 3k blocks. <u>This is going to have upward momentum since we are the only ones with stock</u>. So minimum blocks up thx!" (Emphasis added). [*Id.* ¶ 90].

-   The Tangs knew that LBTD shares were "going to have upward momentum" because they were aware of the scheme to artificially drive up the price of shares of LBTD through fraudulent means. [*Id.* ¶ 91].

-   On Monday, September 18, 2017, the day before the second LBTD hack, BD-2 informed the Tangs that Maximum's account had been closed and no further orders would be taken. [*Id.*¶ 92].

- R. Tang responded, stating, among other things, that he did not understand why the account was being closed and that the Tangs actually held "under 1.5%" of LBTD's outstanding shares, such that the statement about controlling all of LBTD's stock was merely "off the cuff." The statement by R. Tang that the Tangs held "under 1.5%" was false. In fact, when R. Tang made this statement, the Tangs held 2,460,000 shares at BD-2 through Maximum, 105,000 shares at BD-1 through Maximum, and 50,000,000 shares through Avatele, for a total of 52,565,000 shares, or approximately 22.5% of LBTD's outstanding stock. [*Id.* ¶ 93].

## The September 19, 2017 Hack

- On September 19, 2017, from approximately 10:55 a.m. to 2:48 p.m. ET, at least 24 retail brokerage accounts at four U.S. brokerage firms were hacked and forced to buy millions of LBTD shares. The hacks were coordinated by defendant Rahim Mohamed. [*Id.* ¶ 95].

- Although LBTD's stock price on September 19, 2017, opened at $0.079 and closed at $0.05, its intra-day high jumped to $0.28—more than triple its opening price. Further, LBTD's daily trading volume was over 11.5 million shares on September 19, 2017, as compared to just 400 shares the previous day. The hacked brokerage accounts suffered substantial losses. The hacking victims'

brokerage firms ultimately reimbursed their customers, with total losses to the brokerage firms exceeding $1 million.  [*Id.* ¶ 96].

-   Defendants H.E. Capital and POP Holdings, acting as nominee accounts for the Wongs, were the principal sellers on September 19, 2017.  [*Id.* ¶ 97].

## B.    ARGUMENT

As a result of the above conduct, defendants Harmony and Maximum aided and abetted violations of the antifraud provisions of the securities laws; specifically, Section 17(a) of the Securities Act [15 U.S.C. 77q(a)], Section 10(b) of Exchange Act [15 U.S.C. 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. 240.10b5,  and, as a result of the conduct alleged herein, defendants Avatele and Maximum violated, and unless restrained and enjoined will continue to violate, Sections 13(d) and 16(a) of the Exchange Act [15 U.S.C. §§ 78m(d) and 78p(a)] and Rules 13d-1 and 16a-3 thereunder [17 C.F.R. §§ 240.13d-1 and 240.16a-3]. [*Id.* ¶¶ 10, 13].

### 1.   <u>Maximum and Harmony Aided and Abetted Violations of the Antifraud Provisions</u>

Section 17(a) of the Securities Act [15 U.S.C. 77q(a)], which proscribes fraudulent conduct in the offer or sale of securities, and Section 10(b) of the Exchange Act [15 U.S.C. 7j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder, which proscribe fraudulent conduct in connection with the purchase or sale of securities, prohibit essentially the same type of conduct. *United States v. Naftalin*, 441 U.S. 768,

777-78 (1979). The ATOs in this case, which involve hacking into customer accounts and causing those accounts to make purchases which were not, in fact, authorized by the owners, were clearly fraudulent. *See, e.g., SEC v. Dorozhko*, 574 F.3d 42, 51 (2d Cir. 2009).

Section 17(a)(1) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, require a finding of scienter in order to establish a violation. *Aaron v. SEC*, 446 U.S. 680 (1980). Scienter has been defined by the Supreme Court as an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 192 (1976). The ATO scheme was clearly carried out with scienter. A finding of scienter is not required to establish a violation of Section 17(a)(2) or (3) of the Securities Act. *See Aaron*, 446 U.S. at 696-97.

Under Securities Act Section 15(b) and Exchange Act Section 20(e), to establish aiding and abetting, the Commission must prove: (1) a primary securities law violation by another party; (2) that the aider and abettor provided substantial assistance to the primary violator; and (3) that the aider and abettor acted knowingly or recklessly. *SEC v. Big Apple Consulting USA, Inc.,* 783 F.3d 786, 798-801 (11th Cir. 2015).

Maximum and Harmony aided and abetted the Tangs' and the Wongs' above-discussed antifraud violations by serving as the vehicles through which the Tangs, and later the Wongs, acquired, held, and disposed of millions of LBTD shares. At

least some of those shares were sold during the ATOs; thus, Defendants' conduct was a critical component of the fraud.

The Tangs acted with scienter, which is a mental state embracing intent to deceive, manipulate or defraud. *See Hochfelder*, 425 U.S. at 193. Defendants were controlled by the Tangs, who knowingly coordinated with other defendants to facilitate the fraud. The Tangs' scienter is imputed to Defendants. *SEC v. Manor Nursing Centers, Inc.*, 458 F. 2d 1082, n.18 (2nd Cir. 1972).

> ### 2. <u>Defendants Maximum and Avatele Violated the Beneficial Ownership Reporting Provisions, Exchange Act §§ 13(d) and 16(a)</u>

Exchange Act Section 13(d)(1) [15 U.S.C. §§ 78m(d)(1)] and Rule 13d-1(a) [17 C.F.R. §§ 240.13d-1(a)] require any person who directly or indirectly becomes the "beneficial owner" of more than 5% of a class of registered equity securities that has voting rights to file Schedule 13D to report such ownership within 10 days after the acquisition. A beneficial owner includes "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares" voting or investment power over an equity security, including the power to direct the disposition of the security. Rule 13d-3(a). Exchange Act Section 13(d)(3) and Rule 13d-5(b)(1) add that, when two or more persons act or agree to act as a group for the purpose of acquiring, holding, or disposing of securities of an issuer, such group is deemed to be a "person" for

purposes of Section 13(d)(1).  A group is construed broadly, and an agreement may be formal or informal and shown by circumstantial evidence, since two or more persons need only have "'formed a combination in support of a common objective.'"  *SEC v. Jammin Java Corp.*, No. 2:15-cv-08921-SVW-MRV, 2016 WL 6595133, at *18 (C.D. Cal. July 18, 2016) (citations omitted).

Pursuant to Exchange Act Section 16(a), [15 U.S.C. § 78p(a)] and Rule 16a-3 [17 C.F.R. § 240.16a-3], every person who is directly or indirectly the beneficial owner of more than 10% of a class of registered equity securities that has voting rights, or who is an issuer's director or officer, must file Form 3 within 10 days after becoming subject to the reporting obligation.  Such persons also must timely file Form 4 to report changes in beneficial ownership, and an annual statement on Form 5 to report any holdings that were not reported during the issuer's most recent fiscal year.  For over 10% owners, a beneficial owner under Section 13(d) is also a beneficial owner under Section 16(a).  *See* Rule 16a-1(a)(1).  A person who is subject to Section 16 must report holdings and transactions in which that person "directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities." Rule 16a-1(a)(2).  A pecuniary interest is the "opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." *Id.*

Violations of Sections 13(d) and 16(a) do not require scienter. *SEC v. E-Smart Technologies, Inc.*, 82 F. Supp. 3d 97, 104 (D.D.C. 2015).

Defendants Maximum and Avatele, operating under the control of the Tangs, violated Sections 13(d) and 16(a), and Rules 13d-1 and 16a-3 because, when they owned over 5% I/O and/or 10% I/O of LBTD, they failed to file required reports. The Tangs, Maximum, and Avatele acted, and agreed to act, as a group, and collectively had the power to direct the disposition of their LBTD shares and profit from any sales. [Dckt. 1, ¶¶ 3,4,54, 68-69]. Effective November 30, 2016, Avatele acquired 50,000,000 LBTD shares from Nagy, then about 60% I/O. When combined with Maximum's remaining shares, the group beneficially owned about 63% I/O, but failed to file Schedule 13D to report their beneficial ownership exceeding 5%, or Form 3 to report becoming a 10% owner, or Forms 4 and 5 regarding later transactions. [Id. ¶¶ 8, 69, 89].

On September 15, 2017, when Maximum sold 40,000 LBTD shares through Glendale, the group continued to own over 10% I/O, but failed to file Form 4 to report the disposition. [*Id*. ¶89]. In addition, the group owned over 10% I/O during LBTD's fiscal years ended March 31, 2017, and March 31, 2018, and failed to file Form 5s to report the delinquent transactions they failed to report during those fiscal years. *See* Rule 16a-3(f)(1). [*Id.* ¶¶ 93, 100].

### 3.    A Permanent Injunction is Appropriate

In deciding whether to issue an injunction, courts seek to determine whether there is a reasonable likelihood that the defendants, if not enjoined, will engage in future illegal conduct.  *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir.), *cert. denied*, *Holliday v. SEC*, 469 U.S. 1034 (1984); *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 100 (2d Cir. 1978); *SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).  A court will look at several factors such as egregiousness of the violations, isolated or repeated nature of the violations, the level of scienter, the defendant's recognition of the wrongful nature of his conduct, likelihood that the defendant's occupation will afford him opportunities for future violations and the defendant's age. *Youmans*, 729 F.2d at 415.

In this case, Avatele, Harmony and Maximum are shell companies used by fraudsters to perpetuate an egregious fraud.  The Defendants could be used by the Tangs or others for similar activities in the future.  Injunctive relief is appropriate.

### 4.    The Court Should Order the Requested Civil Penalties

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Commission to seek civil penalties against any person or entity who violated those acts.  For violations generally, the statute permits penalties of up to $115,231 for persons other than natural persons.  For violations that involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory

requirement" and "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," a court may impose a maximum "third tier" civil penalty, for each such violation, in an amount not to exceed: (1) the greater of $1,152,314 for persons other than a natural person or, (2) the gross amount of "pecuniary gain" to the defendant as a result of the violation. *See* SEC Release Nos. 33-11263; 34-99276; (Jan. 15, 2024) (inflation adjustments to civil monetary penalty amounts for civil penalties imposed after January 15, 2024).

Civil penalties are intended to punish the wrongdoer and deter the wrongdoer from future securities violations. *SEC v. Monterosso,* 756 F.3d 1326, 1338 (11th Cir. 2014). When determining whether and what civil penalties to impose, courts consider numerous factors, including the egregiousness of the violations, the isolated or repeated nature of the violations, the degree of scienter involved, and the deterrent effect given the defendants' financial worth. *SEC v. Miller,* 744 F. Supp. 2d 1325, 1344 (N.D. Ga. 2010).

Here, the Commission requests that the Court impose civil penalties in the amount of $115,231 against defendant Avatele, which violated the ownership reporting provisions, and $1,152,314 each against defendants Harmony and Maximum, which aided and abetted violations of the antifraud provisions.

The requested penalties are appropriate because Defendants' conduct facilitated a significant and grossly fraudulent scheme that cost the victims substantial losses. *See, e.g., SEC v. Revolutions Med. Corp.,* 2018 WL 2057357, at *5 (N.D. Ga. Mar. 16, 2018).[1] In fact, its hard to conceive of a more egregious scheme in the securities fraud context than accumulating penny stocks in nominee accounts (such as those of the Defaulted Defendants) and then hacking into unaware brokerage customers' accounts and forcing them to purchase the stocks at inflated prices. The requested penalties are absolutely justified.

### 5. Penny Stock Bars Should be Imposed Against Maximum and Harmony

Securities Act Section 20(g) and Exchange Act Section 21(d)(6) authorize a court to impose a penny stock bar against any person who is, or was at the time of the misconduct, participating in an offering of penny stock. The statutes define "participation" in a penny stock offering to include "any person engaging in activities with a broker, dealer, or issuer for the purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock." *See* 15 U.S.C. §§ 77t(g)(2), 78u(d)(6)(B).

---

[1] The proposed final judgment also empowers the Commission, pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7246(a)], to distribute to harmed investors, if feasible, any collected civil penalties.

In deciding whether to order such relief, the Court considers the following factors:

> [the] egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*SEC v. Almagarby*, 92 F.4th 1306, 1321 (11 Cir. 2024).

LBTD was a "penny stock" during the relevant period because its stock was an equity security that did not meet any of the exceptions from the definition of a penny stock contained in Exchange Act Section 3(a)(51) and Rule 3a51-1.   As part of their misconduct, Maximum and Harmony were engaged in the offering of penny stocks by buying and selling LBTD shares.  Penny stock bars are thus appropriate for Maximum and Harmony, given the egregiousness of the scheme, their aiding and abetting of antifraud violations, and the fact that they were used by the Tangs to facilitate activities with broker-dealers or for the purpose of trading, or inducing or attempting to induce the purchase or sale of LBTD.

## CONCLUSION

For the reasons set forth above, the Commission respectfully requests that the Court issue a final judgment against Harmony, Maximum and Avatele, including injunctive relief, a penny stock bar against Harmony and Maximum, and the penalties requested above.

Dated: April 19, 2024.

*/s/ William P. Hicks*
William P. Hicks
Senior Trial Counsel
Georgia Bar No. 351649
hicksw@sec.gov

Robert K. Gordon
Senior Trial Counsel
Georgia Bar No. 302482
gordonr@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

Counsel for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE
Suite 900
Atlanta, Georgia 30326
Tel: (404) 842-7600

## <u>CERTIFICATION OF COMPLIANCE</u>

This is to certify that the foregoing was prepared using Times New Roman 14 point font in accordance with Local Rule 5.1(B).

*/s/ William P. Hicks*
William P. Hicks
Senior Trial Counsel

## <u>CERTIFICATE OF SERVICE</u>

On April 19, 2024, I electronically filed the foregoing Memorandum with the Office of the Clerk, using the CM/ECF system.  Notification of this filing will be served electronically by the Clerk on all counsel of record.


*/s/ William P. Hicks*
William P. Hicks
Senior Trial Counsel